IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROBERT M. KRISTOFF,          )
           Plaintiff     )
                        )
   vs.                    )      Civil Action No. 06-644
                        )      Judge Terrence F. McVerry/
COMMISSIONER OF SOCIAL    )      Magistrate Judge Amy Reynolds Hay
SECURITY,              )
         Defendant  )

REPORT AND RECOMMENDATION

I.     RECOMMENDATION

It is respectfully submitted that the Motion for Summary Judgment filed by

Plaintiff [Dkt. No. 6] be denied.  It is further recommended that the Motion for Summary

Judgment filed by Defendant [Dkt. No. 8] be granted and that the decision of the Commissioner

denying Plaintiff's application for disability insurance benefits be affirmed.

II.    REPORT

    A.    **Procedural History**

Plaintiff, Robert Kristoff, brought this action under 42 U.S.C. § 405(g), seeking

judicial review of the final decision of the Commissioner of Social Security ("Commissioner")

denying his claim for disability insurance benefits ("DIB") under Title II of the Social Security

Act (the "Act"), 42 U.S.C. §§ 401-433.

In his application, protectively filed on January 16, 2004, Plaintiff claimed

disability since December 17, 1999, due to psychological problems (Tr. 38, 66-68, 77).  The state

agency denied his claim on May 10, 2004, and Plaintiff subsequently requested a hearing before

an administrative law judge ("ALJ") (Tr. 45-50, 53).

A hearing was held on October 5, 2005, at which time Plaintiff, who was

represented by counsel, and a vocational expert ("VE") were called to testify (Tr. 28-44).  The

ALJ issued a decision on October 27, 2005 (Tr. 13-21), finding that Plaintiff has the residual function capacity to perform simple, low-stress work with no more than occasional contact with others in the work place and, therefore, was not disabled under the Act (Tr. 20).  The Appeals Council denied Plaintiff's request for review on April 21, 2006, making the ALJ's decision the final decision of the Commissioner (Tr. 5-7, 11-12).

**B.     Factual Background**

Plaintiff was born on June 14, 1944, and, thus, was 61 years old at the time of the hearing (Tr. 32).  Plaintiff lives with his wife and has a college degree in psychology (Tr. 32-33).

After graduating from college, Plaintiff worked for four months at Jones and Laughlin steel mill as a laborer and then, in 1970, worked as a salesman for Sears and Roebuck for four months (Tr. 69-75, 109).  In 1972, he worked for four months as a coordinator for the Committee to Re-Elect the President (Tr. 69-75, 109), and in 1982, he worked for the University of Pittsburgh as a Programmer for four months (Tr. 69-75, 109).  In 1989, Plaintiff was a Programmer for Duquesne University for a one year and then began working for Westinghouse Electric Corporation as a Coordinator where he remained for four years (Tr. 69-75, 109).  In 1993, he began working as a manager for Allegheny County Sanitary Authority, later being promoted to an administrative assistant in 1996, and a deputy director in 1997 (Tr. 69-75, 109).  Plaintiff remained in that position until December of 1999 when his position was eliminated (Tr. 33).

**C.     Medical History**

It is undisputed that Plaintiff has a history of psychological difficulties stemming from allegations of emotional, physical and sexual abuse as a child (Tr. 130).  Plaintiff was hospitalized in 1975 for severe depression and suicidal ideation following which he attended outpatient therapy with several different therapists until 1987 and again from 1992 to 1993 (Tr.

2

106, 116, 137).  During the late 1980's he took Paxil for a period of time which he subsequently discontinued (Tr. 130).

   In July of 1999, Plaintiff began treatment at Isaly Counseling Services because of recent panic attacks which were triggered by situations where Plaintiff felt confined or restricted (Tr. 115-116).  Plaintiff attributed the attacks to the sexual abuse he suffered as a child in which physical restraint played a role (Tr. 115).  Plaintiff also expressed concern over his wife's compulsive behavior of collecting "goods" and stacking them everywhere in the house and his relationship with his son from a previous marriage from whom he had been estranged most of his life (Tr. 115).  Constance L. Lappa, a Licensed Social Worker, noting that Plaintiff was working in a high level position at the time, diagnosed Plaintiff with major depression, moderate and panic disorder without agoraphobia (Tr. 115, 116).  Plaintiff continued counseling with Ms. Lappa until July of 2001, when his insurance ran out (Tr. 115, 116).  During the course of his treatment Plaintiff was treated at varying times with Paxil and Prozac and, upon discharge, the diagnosis was bipolar I, most recent episodes mixed, and generalized anxiety disorder and prescribed Effexor (Tr. 116).  At that time, Ms. Lappa reported that Plaintiff's panic attacks had been brought under control and, although anxiety occurred again with Plaintiff job loss, he was able to manage it fairly well by the time he stopped treatment (Tr. 116).  Further, despite Ms. Lappa's offer to charge Plaintiff on a sliding scale and his indication that he would return in about a month, he did not do so (Tr. 116).

   Plaintiff also reported anxiety and panic attacks to his family physician in July of 1999, and was subsequently treated with Avitan, Paxil and Effexor (Tr. 116, 117-125).

   On September 22, 2003, Plaintiff telephoned Allegheny Crisis Emergency Services at Mercy Hospital requesting treatment for depression (Tr. 145-46), and began treating with psychiatrist Julie Garbutt, M.D., whom he testified he saw once every two months and

therapist Don Pickerine, whom he saw every two weeks (Tr. 34, 128-46, 167-87).[1]   In December

of 2003, Dr. Garbutt noted that Plaintiff presented with a history of post-traumatic stress disorder

symptoms based on childhood abuse and recurrent Major Depressive Disorder associated with

anxiety symptoms, further noting that Plaintiff was having difficulty grieving the recent loss of

his mother due, in part, to the favoritism she had shown to his brother throughout his life and in

her will (Tr. 130).  Dr. Garbutt found Plaintiff's mood depressed with tearful episodes, that his

affect was full range but frequently depressed, his thought process was goal oriented and negative

for suicidal thoughts, hallucinations, delusions or paranoia, that he was alert and oriented to

person, place, time, and his insight, judgment and memory were good (Tr. 130).  Dr. Garbutt also

noted that Plaintiff had improved since he had begun therapy with Dr. Pickerine despite the fact

that he was not taking psychiatric medications, which she thought would be beneficial, but

nevertheless assessed Plaintiff's global functioning at 40 (Tr. 130-31).[2]  Dr. Garbutt noted,

however, that she expected Plaintiff's GAF to rise to 70 at discharge (Tr. 132).  Indeed, in

February of 2004, a month after Dr. Garbutt started Plaintiff on Lexapro, it was reported that

Plaintiff had "made some progress" and that his GAF had risen to 52 and, in March of 2005, it

was assessed at 59 (Tr. 82, 101, 127, 128-29, 165, 167-68, 169, 171, 175, 177, 184, 186).[3]

---

[1]   Although Plaintiff at testified at the administrative hearing that he saw Dr. Garbutt "once every two months" (Tr. 34), the record is not entirely clear on this point as Plaintiff also indicated on the Disability Report that he saw her "quarterly" (Tr. 105).  As well, Dr. Garbutt noted in February of 2005, that she saw Plaintiff "weekly to every four weeks" (Tr. 165).

[2]   Global Assessment of Functioning ("GAF") is an indicator of the individual's overall level of functioning.  Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. 1994).  A GAF of 31-40 indicates major impairment in areas such as work, school, family relations, judgment or mood while a GAF of 41-50 suggests serious symptoms or serious impairment in social, occupational or school functioning.  Id.

[3]   A GAF of 51-60 represents moderate symptoms such as flat affect, circumstantial speech, and occasional panic attacks, or an individual who has moderate difficulty in social, occupational or school functioning.  Diagnostic and Statistical Manual of Mental

Nevertheless, in February of 2005, Dr. Garbutt completed a medical assessment checklist concluding that Plaintiff was unable to complete a normal workday and week without interruptions from psychologically based symptoms (Tr. 165-66).  Dr. Garbutt also indicated that Plaintiff had only fair ability to remember work-related procedures, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without undue distraction, accept instructions and respond appropriately to criticism, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in routine settings, deal with normal work stress, and be aware of normal hazards and take appropriate precautions (Tr. 165).  As well, Dr. Garbutt assessed Plaintiff's ability to understand and remember very short and simple instructions, maintain attention for a two hour segment, make simple work-related decisions and ask simple questions and ask for assistance as good, and that his ability to carry out very simple and short instructions was unlimited or very good (Tr. 165).  Although Dr. Garbutt indicated that Plaintiff's ability to maintain regular attendance and punctuality was good she also indicated that he would be absent from work on the average of twice a month if working part-time and more often if working full-time (Tr. 165, 166).

On May 5, 2005, Sanford Golin, Ph.D., a state agency psychological consultant, reviewed the medical evidence of record (Tr. 147-63), and concluded that Plaintiff could perform work in the national economy despite his moderate limitations (Tr. 149).

**D.      Hearing Testimony and ALJ Decision**

At the administrative hearing, Plaintiff, who was represented by counsel, testified that he was born on June 14, 1944, and, thus, was 61 years old at the time of the hearing, that he lives with his wife and has a college degree in psychology (Tr. 32-33).  Plaintiff indicated that he

_____

Disorders, 32 (4th ed. 1994).

became disabled on December 17, 1999, but that he stopped working because his position was eliminated and he was fired (Tr. 33).

Plaintiff testified that he receives regular mental health treatments at Mercy Hospital, that he sees Dr. Julie Garbutt about once every two months and sees his counselor one-on-one for an hour every two weeks (Tr. 33-34). Plaintiff also testified that he feels that the sessions help him deal with his anxiety and that the Lexapro, which he apparently began taking in January of 2004, is very helpful although it has certain side effects including memory loss and decreased concentration (Tr. 34-35, 37, 82, 102, 127, 167-68). Plaintiff allowed that even with the Lexapro he has panic attacks weekly and sometimes multiple times within a week but that most of them are not too bad and those that are more difficult he is able to get things under control with the Lexapro (Tr. 36). When he does have an attack, Plaintiff testified that his heart rate increases and he has a "need to flee, to get out, to get away," and that he avoids groups of people and seeks situations where he is isolated (Tr. 36-37).

When asked to be more specific about his problems with memory and concentration, Plaintiff testified that he had trouble with names more than he used to and that, whether or not he could complete a task once he started depended on its complexity, allowing that he could complete doing the dishes (Tr. 37-38). Plaintiff nevertheless testified that he believed he was unable to perform even a simple job every day for eight hours because when he gets into a situation he gets "caught up in the anxiety" of it and "cannot function" (Tr. 38). When further questioned by counsel, Plaintiff testified that he has been able to deal with things his whole life until his last work situation and now he feels "spent" and that he can't deal with things anymore (Tr. 39).

Noting that evidence of Plaintiff's post-traumatic stress disorder was well covered in the record, the ALJ declined to question Plaintiff about that, as did his attorney, and called the

VE to testify (Tr. 39-40, 43-44).  According to the VE, Plaintiff's past work as a storeroom manager was skilled at the heavy exertional level and his past work as the deputy director of a wastewater plant was skilled professional at the sedentary level (Tr. 41).  The ALJ asked the VE to consider an individual of Plaintiff's age, education, and work history, who has no exertional limitations but was limited to simple, routine, repetitious tasks with one or two-step instructions, that do not have strict production quotas and do not require more than occasional contact with the public, coworkers or supervisors (Tr. 40-41).  Based upon this hypothetical question, the VE testified that such an individual could not perform Plaintiff's past work but could perform jobs such as bench assembly which exist in significant numbers in the national economy (Tr. 42).  In addition, the VE testified that entry-level positions in the medium category, such as hand packers and janitors and cleaner, especially those found in the evenings in schools, hospitals and office buildings, also exist in significant numbers in the national economy (Tr. 42).  The VE also noted that in these positions, employers usually tolerate only one day off per month and allow a fifteen minute break in the morning or afternoon on first and second shifts, and in many cases second and third shifts, and allow a half hour or an hour for lunch depending on the organization (Tr. 43).

Based on this evidence the ALJ found that although Plaintiff's depression and post-traumatic stress disorder were severe impairments they did not meet or equal the impairment listings in 20 C.F.R. § 404.1520(d) (Tr. 18).  The ALJ also found that although Plaintiff's residual functional capacity limits him to simple, low-stress work with no more than occasional contact with others in the work place and that he was unable to perform his past work, he was nevertheless able to perform medium work that existed in the national economy and, thus, was not disabled (Tr. 20).

      **E.**      **Standard of Review**

Presently before the Court are the parties' cross-motions for summary judgment. In reviewing the administrative determination by the Commissioner, the question before the court is whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Kangas v. Bowen</u>, 823 F.2d 775, 777 (3d Cir. 1987). Substantial evidence is defined as less than a preponderance and more than a mere scintilla. <u>Perales</u>, 402 U.S. at 402. If supported by substantial evidence, the Commissioner's decision must be affirmed. <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999).

A five-step process is used to determine disability eligibility. <u>See</u> 20 C.F.R. § 404.1520.[4] Here, the ALJ determined that Plaintiff was not disabled at the fifth step which requires the Commissioner to prove that, considering the claimant's residual functional capacity,[5] age, education, and past work experience, he can perform work that exists in significant numbers in the regional or national economy. 42 U.S.C. § 423(d)(2)(A). <u>See</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 n. 5 (1987); <u>Sykes v. Apfel</u>, 228 F.3d 259, 263 (3d Cir. 2000).

**F.    Discussion**

Plaintiff makes two arguments in this case. He first argues that the ALJ erred by not fully crediting Plaintiff's testimony and subjective complaints which, given Plaintiff's long work record, should have been given substantial consideration.

---

[4]    The five-step sequential evaluation process for disability claims requires the Commissioner to consider whether a claimant: (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his past relevant work, and (5) if not, whether he can perform any other work in the national economy. 20 C.F.R. §§ 404.1520.

[5]    A claimant's "residual functional capacity" is what he can do despite the limitations caused by his impairments. <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 40 (3d Cir. 2001).

> Allegations of pain and other subjective symptoms must be
> supported by objective medical evidence. *See* 20 C.F.R. §
> 404.1529. Once an ALJ concludes that a medical impairment that
> could reasonably cause the alleged symptoms exists, he or she must
> evaluate the intensity and persistence of the pain or symptom, and
> the extent to which it affects the individual's ability to work. This
> obviously requires the ALJ to determine the extent to which a
> claimant is accurately stating the degree of pain or the extent to
> which he or she is disabled by it. *See* 20 C.F.R. § 404.1529(c).

Hartranft v. Apfel, 181 F.3d at 362.  Moreover, while it is true that testimony regarding

subjective complaints from a claimant with a long work record is entitled to "substantial

credibility," it is also true that the ALJ has the right, as the fact finder, to reject partially, or even

entirely, such subjective complaints if they are not fully credible.  Weber v. Massanari, 156 F.

Supp. 2d 475, 485 (E.D. Pa. 2001), citing Baerga v. Richardson, 500 F.2d 309, 312 (3d

Cir.1974).  See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983) (Credibility

determinations as to a claimant's testimony regarding his limitations are for the ALJ to make).

Factors that an ALJ should consider in making his credibility determination include a claimant's

daily activities; the duration, frequency, and intensity of his pain or other symptoms; precipitating

and aggravating factors; the type, dosage, effectiveness and side effects of medication; treatment

other than medication; measures the claimant uses to relieve pain; and other factors.  20 C.F.R.

§§ 404.1529(c)(3)(i)-(vii).

   Further, an ALJ is not required to accept a claimant's testimony uncritically but

may discredit a claimant's subjective complaints when there is contrary medical evidence in the

record and the ALJ explains the basis for rejecting the complaints.  Mason v. Shalala, 994 F.2d

1058, 1067 (3d Cir. 1993).  The ALJ's credibility finding is entitled to deference and should not

be discarded lightly, given his or her opportunity to observe the individual's demeanor.  Murphy

v. Schweiker, 524 F. Supp. 228, 232 (E.D. Pa. 1981).  See Walters v. Commissioner of Social

Security, 127 F.3d 525, 531 (6th Cir. 1997) (An ALJ's findings regarding a claimant's credibility

is entitled to substantial deference.)

Instantly, the ALJ expressly stated that he evaluated Plaintiff's subjective

complaints in accordance with the relevant regulation, 20 C.F.R. § 404.1529, and Social Security

Ruling 96-7p (Tr. 18), and, considering those factors, opined that:

> The claimant testified that he had mental problems all his life but
> had dealt with them until losing his last job, when they became
> aggravated.  It is clear that losing his job was a difficult experience
> for the claimant, but his treatment records ... show that his
> symptoms improved after an initial low level.  The claimant
> testified to weekly panic attacks, but I do not find this frequency
> documented in his treatment records.  He testified generally to
> some loss of memory and concentration.  However, his treatment
> records suggest that his thought processes have remained intact.
> He said that the medication Lexapro was very helpful but caused
> loss of concentration and memory.  I do not find these shown as
> side effects in his medical records.

(Tr. 19-20).  The ALJ further found that Plaintiff's own responses to the activities questionnaire

indicate only mild restrictions in his activities of daily living and pointed to the fact that Plaintiff

initially declined medication due to perceived side effects notwithstanding Dr. Garbutt's position

that medication would be beneficial (Tr. 18, 19).  As well, the ALJ noted that Plaintiff has never

needed treatment at a hospital for a mental impairment, either as an inpatient or at an emergency

room, and that his treatment records do not show a pattern of decompensation (Tr. 19).  It

therefore appears that the ALJ's findings that Plaintiff's subjective complaints are not entirely

credible has substantial support in the record and the fact that Plaintiff may have worked

consistently for a ten year period prior to his alleged disability does not alter that fact.[6]

---

[6]   It should also be noted here that while Plaintiff clearly worked consistently in managerial
positions for those ten years, his work history prior to that time -- from the time he
graduated from college until he was 45 years old -- shows a sporadic work history at best
(Tr. 69-75, 109).

Moreover, it should be noted here that, contrary to Plaintiff's suggestion, the ALJ did not completely discount Plaintiff's testimony but found that his mental impairments could reasonably be expected to give rise to some loss of concentration and inability to deal with the stresses of skilled work and, hence, found that his residual functional capacity was limited to simple, low-stress work, with no more than occasional contact with others in the work place (Tr. 20).

Plaintiff also argues that the ALJ erred by discounting Dr. Garbutt's medical opinion while giving significant weight to the non-examining state agency physician's opinion.

The regulations provide that certain issues are reserved exclusively to the ALJ, including the assessment of a claimant's residual functional capacity and whether he meets the statutory definition of disability. 20 C.F.R. §§ 404.1527(e); 20 C.F.R. § 1546(c). Moreover, a treating physician's opinion about a claimant's ability to work is not entitled to any "special significance" but may be rejected by the ALJ if there is a lack of clinical data supporting it or if there is contrary medical evidence. 20 C.F.R. §§ 404.1527(e). See Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir. 1988); Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985). Further, conflicts in the medical evidence are to be resolved by the ALJ and not the reviewing court. Richardson v. Perales, 402 U.S. 389, 399 (1971). In determining the weight to be given to a medical opinion, the ALJ is to consider the length of the treatment and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion by medical evidence, consistency of the opinion with the record as a whole, and specialization of the treating physician. See 20 C.F.R. §§ 404.1527(d)(1)-(6).

Further, while the state agency physicians are non-examining physicians, they "are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(f). Thus, it is well established that an ALJ may rely on the

opinions of non-examining physicians, even when those opinions contradict the opinion of a treating physician, if the opinions are consistent with the record.  Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991); Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984).

   In the instant case, it appears undisputed that there is little clinical evidence of record.  It also appears that what is of record does not support Dr. Garbutt's conclusions.  Indeed, the only clinical evidence appears to be treatment notes from Plaintiff's family doctor between July of 1999 and June of 2002, which indicate only that he treated Plaintiff for anxiety and that Avitan, Paxil and Effexor were prescribed at various times (Tr. 116, 117-125), and Dr. Garbutt's report of December, 2003, in which she largely reiterates Plaintiff's complaints adding only that Plaintiff had frequent tearful episodes and difficulty articulating his feelings at times due to depression and that his mood is depressed (Tr. 130).  Dr. Garbutt also indicated, however, that Plaintiff was neatly groomed, made good eye contact with no psychomotor abnormalities, was well related and articulate, his affect was full range, his thought process was goal directed, his thought content was negative for suicidal or homicidal thoughts, hallucinations or paranoia, he was alert and oriented to person, place and time had good insight and judgment and his memory was grossly intact (Tr. 130).

   As well, as noted by the ALJ, Dr. Garbutt noted in February of 2005 that Plaintiff had good to fair capacity in most of the vocational categories, including a good capacity to remember work-related procedures, to maintain regular attendance, and make simple work-related decisions, and a very good or unlimited capacity to carry out very short and simple instructions which was consistent with the RFC he adopted limiting Plaintiff to simple, low-stress work, with no more than occasional contact with others thereby reducing stress in the workplace (Tr. 19).  The ALJ also noted that the only poor rating given by Dr. Garbutt was regarding Plaintiff's ability to complete a normal work day without interruption from

psychologically-based symptoms.  The ALJ observed, however, that Dr. Garbutt did not indicate

how often the interruptions would occur in a given work day and indicated that he could not

discern the basis for Dr. Garbutt's opinion that Plaintiff's symptoms would prevent him from

completing a work day in an environment that is simpler and less stressful than that

accompanying a skilled job (Tr. 19).[7]  The ALJ found this particularly confounding as Dr.

Garbutt's own reports indicate that Plaintiff's GAF had steadily risen, albeit gradually, and that

he had never needed inpatient or emergency room treatment for a mental impairment and had no

pattern of decompensation (Tr. 19).

   In this manner, the ALJ found that the state agency's opinion that Plaintiff's

mental impairments, although severe, were not disabling, and which was rendered a year earlier

when Plaintiff GAF was even lower, was more consistent with Plaintiff's treatment records (Tr.

19).

   Moreover, the ALJ also considered Plaintiff's own testimony that he has suffered

from mental problems his whole life but that he was nevertheless able to deal with them and,

apparently, maintain a managerial position for ten years.  Although the ALJ found that the loss of

his job in December of 1999 -- not because of his mental impairment but because his position

was eliminated -- could reasonably be expected to contribute to some loss of concentration and

inability to deal with the stress of skilled work, the ALJ took that into consideration limiting

Plaintiff to simple, low-stress work with only occasional contact with others.  The ALJ also

pointed to the fact that Plaintiff's treatment records showed his symptoms had improved and his

---

[7]  While Plaintiff makes much of the fact that Dr. Garbutt later indicated that she
anticipated that Plaintiff's impairments or treatment would cause absenteeism
from work twice a month if part time and more if full time, she also qualified that
assessment stating, "[t]his is a guess.  Difficult to know" (Tr. 166).  Moreover, Dr.
Garbutt's quantification addresses absenteeism, which interestingly she earlier
stated Plaintiff had a good capacity for, and not interruptions during the work day
which would seemingly be related to stress while on the job.

thought processes were still in tact, and that Plaintiff himself testified that his symptoms were not too bad and that the Lexapro was very helpful.  See 20 C.F.R. § 404.1530 (Claimant must follow treatment prescribed by your physician if this treatment can restore your ability to work and failure to do so precludes entitlement to benefits.)  The ALJ also noted that the record was devoid of any evidence of side effects from the Lexapro (Tr. 20).  In fact, Plaintiff indicated no side effects on his Disability Reports dated February 13, 2004, and June 2, 2004 (Tr. 82, 101).

Moreover, although not relied upon by the ALJ, after Plaintiff lost his job, which coincided with the alleged onset of his disability, he engaged an executive search service to assist him in finding another job which, as argued by the Commissioner, suggests that Plaintiff considered himself able to work (Tr. 115, 138).  Thus, notwithstanding the length and/or frequency of the treatment relationship, Dr. Garbutt's conclusion does not appear to be supported by her own records and appears contrary to other objective evidence.  Under these circumstances, it cannot be said that the ALJ's findings with respect to Dr. Grabutt's opinion are not supported by substantial evidence.

Summary judgment is appropriate when there are no disputed material issues of fact, and the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56; Edelman v. Commissioner of Social Sec., 83 F.3d 68, 70 (3d Cir. 1996).  In the instant case, there are no material factual issues in dispute, and it appears that the ALJ's conclusion is supported by substantial evidence.  For this reason, it is recommended that Plaintiff's motion for summary judgment be denied, that Defendant's motion for summary judgment be granted, and that the decision of the Commissioner be affirmed.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written objections to this report.  Any party opposing the objections shall have seven (7) days from the

14

date of service of the objections to respond thereto.  Failure to timely file objections may

constitute a waiver of any appellate rights.

Respectfully submitted,


/s/ Amy Reynolds Hay
AMY REYNOLDS HAY
United States Magistrate Judge

Dated:   11 December, 2006

cc:     Hon. Terrence F. McVerry
        United States District Judge

        Robert W. Gillikin, II, Esq.
        Robert Peirce & Associates, P.C.
        707 Grant Street
        2500 Gulf Tower
        Pittsburgh, PA 15219

        Megal Farrell
        Assistant United States Attorney
        United States Attorney's Office
        700 Grant Street
        Suite 400
        Pittsburgh, PA 15219